IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LEANARD A. CALABREE and : | |
| JULIA MANIERI as Executors of the : | |
| Estate of Lucille Calabree, : | |
|     Plaintiffs, : | |
| : | CIVIL ACTION |
| v. : | NO. 13-828 |
| : | |
| EATON MEDICAL PLAN FOR : | |
| RETIREES, : | |
|     Defendant. : | |

**Jones, J.**                                                                                                    **April 14, 2016**

**MEMORANDUM**

    Now pending before the Court is Defendant's Motion for Summary Judgment (MSJ) (Dkt No. 39), including Defendant's Statement of Undisputed Facts (Def.'s SUF), Plaintiffs' Response in Opposition to Defendant's Motion for Summary Judgment (Pls.' Resp.) (Dkt No. 42), including Plaintiffs' Response to Defendant's Statement of Facts (Pl.'s RSOF), and Defendant's Reply in Support of Motion for Summary Judgment (Rep.) (Dkt No. 46), including Defendant's Reply to Plaintiffs' Response to Defendant's Statement of Undisputed Material Facts and Additional Statement of Facts (Def.'s Rep. to Pls.' RSOF) (Dkt No. 44).

    For the reasons that follow, summary judgment will be granted in favor of Defendant and against Plaintiffs.

**I.   Facts**

    Decedent, Ms. Lucille Calabree, was the widow of a former employee of the Eaton Corporation who retired before his death. (Def.'s SUF ¶ 1; Pls.' RSOF ¶ 1.) As such, Ms. Calabree received medical care coverage under the Eaton Medical Plan for Retirees and Other Eligible Individuals ("the Plan"). (Def.'s SUF ¶ 1; Pls.' RSOF ¶ 1.) The Plan consists of a "wrap document" and a Summary Plan Description ("SPD").[1] (See Def.'s SUF ¶ 2; Pls.' RSOF ¶ 2.)

---

[1] Plaintiffs dispute the applicability of the SPD, but acknowledge that they have no facts to contest that the SPD was incorporated into the Plan – "Plaintiffs are unable to determine whether the Summary Plan Description was properly incorporated as a governing plan document, as the Magistrate Judge denied plaintiff's discovery request designed to make that determination." (Pl.'s RSOF ¶ 2.) Magistrate Judge Sitarski denied that request

1

This Summary Plan Description excluded "custodial care" from coverage under the Plan, which it defined as:

> Care given to a patient who is mentally or physically disabled and the disability is expected to be prolonged; requires a protected, monitored and controlled environment whether in an institution or in the home; requires assistance to support the essentials of daily living; and is not under active and specific medical/surgical or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored or controlled environment.

(Def.'s SUF ¶ 3; Pls.' RSOF ¶ 3; SPD at 10, A.R. at 116.)

On or about April 19, 2011, the Plan received an explanation of benefits issued regarding the denial of Medicare benefits to Ms. Calabree. (Def.'s SUF ¶ 4; Pls.' RSOF ¶ 4.) The Health Claim Administrator then determined that Ms. Calabree's care at Pickering Manor—a residential nursing facility—was custodial, and thus excluded from the Plan's coverage. (Chronology of Claim Administration, A.R. at 184.) Ms. Calabree's attorney later demanded payment, which the Claim Administrator treated as an appeal. Ultimately, on November 15, 2011, this appeal was denied. (Def.'s SUF ¶ 6; Pls.' RSOF ¶ 6.)

On November 21, 2011, Ms. Calabree's attorney filed a second appeal, which triggered a "fresh look" by the Plan Administrator, the Eaton Corporation Health and Welfare Administrative Committee (the "Benefit Committee"). (Def.'s SUF ¶ 8; Pls.' RSOF ¶ 8.) The Benefit Committee undertook this review without any deference to the prior denial decision, and was comprised only of individuals without any involvement in the prior denial. (Def.'s SUF ¶ 8; Pls.' RSOF ¶ 8.)

As part of the appeals process, the Benefit Committee commissioned the Medical Review Institute of America, Inc. (MRIOA) to complete an independent review of Ms. Calabree's case. (Def.'s SUF ¶ 9; Pls.' RSOF ¶ 9.) The MRIOA reached its conclusions based on a myriad of different sources, which the Court will describe in greater detail. (A.R. 179-181). Initially, MRIOA review references a letter authored by Ms. Calabree's treating physician, Dr. Michelle

---

because "Defendant ha[d] already provided the materials Plaintiffs require to determine if the SPD in fact provides an enforceable plan term[.]" (Dkt No. 33 at 12.) At the summary judgment stage, Plaintiffs cannot seek to relitigate what is already the law of the case regarding discovery. *In re City of Phila. Litig.*, 158 F.3d 711, 718 (3d Cir. 1998). Plaintiffs' inability to point to any facts in the record to contest the validity of the SPD makes this an undisputed fact. The Court will therefore consider the language of both the Wrap Document and the SPD in reviewing the administrative decision.

Scannapieco, dated July 19, 2011. (A.R. 179; see also A.R. 268.) In that letter, Dr. Scannapieco describes Ms. Calabree's "complicated medical history," and notes that she suffered from "severe dementia with behavior disturbances, gait dysfunction, multiple myeloma, anemia, hypertension and neuropathy." (A.R. 179, 268.) Dr. Scannapieco also recommended that Ms. Calabree "have nursing care and supervision twenty four hours per day due to her medical condition." (A.R. 179, 268.) The Court notes that the MRIOA reviewer did not actually speak with Dr. Scannapieco, although it did attempt to contact her several times. (A.R. 179.)

The MRIOA review also references a series of additional evaluations from physical therapists, physicians, and at least one psychiatrist:

- A rehabilitation screen conducted on August 5, 2011, which stated that Ms. Calabree has poor safety awareness and requires assistance for all activities, but that there are "no skilled rehabilitation needs at this time." (A.R. 180.)
- A psychiatric note dated June 30, 2011 which indicates a diagnosis of dementia with behavioral disturbances and recommends medication changes. (A.R. 180.)
- A series of physicians' notes from November, 2010, and April, June, July, and August of 2011. (A.R. 180.) According to the MRIOA, these "extensive physician progress notes do not document the need for skilled therapy or nursing services." (A.R. 180.)
- A physical therapy weekly progress note covering the week of January 6, 2011 through January 13, 2011, which the MRIOA review asserts "do not support that even if the stated therapy goals were achieved, which they were not, that disability would be reduced to the extent necessary to enable the patient to function outside the protected, monitored or controlled environment." (A.R. 180.)
- A therapy discharge note covering the period between December 7, 2010 and January 27, 2011, indicating "that none of the long-term therapy goals were achieved." (A.R. 181.)

Ultimately, based on the foregoing, the MRIOA reviewer concluded that Ms. Calabree's care was "not medically necessary, it was custodial." (Def.'s SUF ¶ 15; Pls.' RSOF. ¶ 15) (quoting A.R. at 182). According to the reviewer:

> This individual [Ms. Calabree] has a prolonged (permanent) disability requiring a protected, monitored and controlled environment. This

> individual requires assistance to support the essentials of daily living. There was no active and specific care being provided that would reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored or controlled environment.

(A.R. 182.)

Aside from the MRIOA review, the Benefit Committee also considered a second letter from Ms. Calabree's physician, Dr. Scannapieco, dated May 3, 2011. (Def.'s SUF ¶ 16.) In that letter, Dr. Scannapieco writes that Ms. Calabree "is unable to take care of her financial affairs, make medical decisions or make decisions regarding her Power of Attorney regard [sic] due to a diagnosis of moderate to severe dementia." (A.R. 219.)

Based on the MRIOA's review and the Scannapieco letter, the Benefit Committee determined that Ms. Calabree's care was custodial in nature, and thus excluded under the provisions of the Plan. (Def.'s SUF ¶ 17; Pls.' RSOF. ¶ 17). The Plan, however, did pay for a six-month transition period for Ms. Calabree. (Def.'s SUF ¶ 18; Pls.' RSOF. ¶ 18.)

## II. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), a court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); FED. R. CIV. P. 56(a). "If the moving party meets its burden, the burden shifts to the nonmoving party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal citations and quotation marks omitted). Therefore, in order to defeat a motion for summary judgment, the non-movant must establish that the disputes are both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law; and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "At the summary judgment stage of proceedings, courts do not 'weigh the evidence or make credibility determinations,' but, instead, leave that task to the fact-finder at a later trial if the court denies summary judgment." *Halsey v.*

*Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) (quoting *Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1230 (3d Cir. 1993)).

### III. Standard of Review

The parties dispute whether this Court must apply a *de novo* standard of review or whether the Court must review the decision under the arbitrary and capricious standard. Although the parties dispute the applicable standard, they agree that the deciding factor is whether the decision-makers were granted discretionary authority to decide the claim.[2] *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 111 (1989). "When the administrator has discretionary authority to determine eligibility for benefits . . . the decision must be reviewed under an arbitrary and capricious standard." *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009). Therefore, the critical question is whether the administrator in this case had discretionary authority. To decide this, the Court turns to the language of the plan itself.

The Wrap Document states that:

> The Plan Administrator and its delegate pursuant to Subsection (c) of this Section shall have the sole and absolute authority and responsibility for construing and interpreting the provisions of the Plan, subject to any applicable requirements of Law. The Plan Administrator's powers include, but are not limited to ... interpreting the Plan, deciding all questions concerning eligibility of persons to participate in the Plan, construing any ambiguous provisions of the Plan ...

(Wrap Doc. At 5; A.R. at A008.) In addition, the Summary Plan Document that became effective on January 1, 2011 and is applicable to Plaintiffs' claim challenging payments from the January 1, 2011 through November 15, 2011 time period, states that "The Plan Administrator and/or Health Plan Claims administrator has discretionary authority to determine eligibility for benefits and construe any and all terms of the Plan . . ." (SPD at 66, A.R. at 172.) The language of the Wrap Document alone granting the administrator "sole and absolute authority and responsibility for construing and interpreting provisions of the Plan," and powers including, but not limited to interpreting and construing the plan in addition to deciding all questions concerning eligibility

---

[2] Plaintiffs further argue that, even if an arbitrary and capricious standard applies, Defendant loses that deferential standard of review for failing to comply with Department of Labor regulations. (Resp. 8-9.) The language of the regulations themselves, however, requires only "a reasonable claims procedure." 29 C.F.R. § 2560-503-1(1). Plaintiffs challenge the procedure based on Defendant interpreting a letter from Plaintiffs' counsel as a request for an appeal rather than an initial request for benefits. (Resp. 8.) Taking this as true, there is no precedent for treating this type of miscommunication as a failure to provide "a reasonable claims procedure" and Plaintiffs cite no cases in support of this argument. Therefore, this miscommunication does not change the applicable standard of review.

clearly grants the administrator discretion. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 436 (3d Cir. 2001) (recognizing that "a written clause explicitly granting authority to the plan administrator to interpret the terms of the plan" grants discretion in the typical ERISA plan and even in more the atypical top hat plan). The Court must therefore review the administrative decision to determine whether it was arbitrary and capricious.

"Under a traditional arbitrary and capricious review, a court can overturn the decision of the plan administrator only if it is without reason, unsupported by substantial evidence or erroneous as a matter of law." *Doroshow*, 574 F.3d at 234 (citing *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993)); *see also Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2001) ("An administrator's decision is arbitrary and capricious if it is without reason, unsupported by substantial evidence or erroneous as a matter of law."). "An administrator's interpretation is not arbitrary if it is 'reasonably consistent with unambiguous plan language.'" *Fleischer v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Bill Gray Enters. v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001)). "When a plan's language is ambiguous and the administrator is authorized to interpret it, courts 'must defer to this interpretation unless it is arbitrary or capricious.'" *Id.* (quoting *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 143 (3d Cir.2003)). "'The determination of whether a term is ambiguous is a question of law. A term is ambiguous if it is subject to reasonable alternative interpretations.'" *Id.* (citing *Taylor v. Cont'l Group Change in Control Severance Pay Plan*, 933 F.2d 1227, 1233 (3d Cir.1991)). "The scope of this review is narrow, and 'the court is not free to substitute its own judgment for that of the defendants in determining eligibility for plan benefits.'" *Dorowshow*, 574 F.3d at 234 (quoting *Abnathya*, 2 F.3d at 45).

### IV. Discussion

#### a. Count I – Claim for Benefits Under ERISA

Plaintiffs seek to recover on the basis that "Ms. Calabree's care was medically necessary and non-custodial and, as such, the denial of benefits to Ms. Calabree was incorrect and contrary to the terms of the Plan and arbitrary and capricious as a matter of law." (Compl. ¶ 19.) Because the Court reviews the administrative decision under the arbitrary and capricious standard, the Court must determine whether the *decision* is arbitrary and capricious not whether the defendant perfectly followed every procedure to a tee on the way to reaching that decision. *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2001). The scope of the court's review is narrow and is

simply to determine whether the decision is supported by the evidence contained within the administrative record. *Doroshow v. Hartford Life & Acc. Ins. Co.*, 574 F.3d 230, 234 (3d Cir. 2009). The Court's review therefore requires reviewing the definition of "custodial care" and the evidence in the administrative record to determine whether the Plan administrator abused its discretion in deciding that the evidence showed Ms. Calabree was in custodial care.

The evidence contained within the administrative record demonstrates that Ms. Calabree suffered from "severe dementia with behavior disturbances, gait dysfunction, multiple myeloma, anemia, hypertension and neuropathy." (A.R. 180.) Ms. Calabree was in need of supervision around the clock to ensure her safety and to assist her in all daily activities. (A.R. 180.) Ms. Calabree was in need of "supportive care" for her dementia, but had "no skilled rehabilitation needs," or needed any attention that required skilled nursing services. (A.R. 180.) Ms. Calabree was provided physical therapy in an attempt to improve transfers and mobility, but such treatment would only improve functioning within the protected, monitored, or controlled environment; it would not permit her to function outside of the nursing home. (A.R. 180.) The administrative record demonstrates that Ms. Calabree was a 91-year-old suffering from severe dementia for which no treatment was provided, but required Ms. Calabree be supervised and assisted around the clock.

Ms. Calabree's Plan provided coverage for stays in a "Skilled Nursing Facility," but not for stays that constituted "custodial care."

The SPD defines "Skilled Nursing Facility" as, in pertinent part:

> The facility must be primarily engaged in providing continuous skilled nursing care for persons during the convalescent stage of their illness or injury, and is not, other than by coincidence, a rest home for custodial care or for the aged.

(SPD at 15; A.R. at 121.) In comparison, the SPD defines "custodial care" as:

> Care given to a patient who is mentally or physically disabled and the disability is expected to be prolonged; requires a protected, monitored and controlled environment whether in an institution or in the home; requires assistance to support the essentials of daily living; and is not under active and specific medical/surgical or psychiatric treatment that will reduce the disability to the extent necessary to enable the patient to function outside the protected, monitored or controlled environment.

(SPD at 10; A.R. at 116.) The critical difference between the two definitions is whether the person is convalescing and thus is actually working toward recovery or whether the person is

being cared for until death. Therefore, with these two definitions in mind, the Court will review the evidence in the administrative record to determine whether it was reasonable to conclude that Ms. Calabree was not convalescing, but rather required protection, monitoring, and assistance in the essentials of daily living.

"On a motion for summary judgment in an ERISA case where the plaintiff claims that benefits were improperly denied, a reviewing court is generally limited to the facts known to the plan administrator at the time the decision was made." *Eppley v. Provident Life and Acc. Ins. Co.*, 789 F.Supp.2d 546, 565 (E.D.Pa.2011) (quoting *Post v. Hartford Ins. Co.*, 501 F.3d 154, 168 (3d Cir.2007)). At the time of the final review, the evidence included two letters from Ms. Calabree's physician, the review by the Internal Medicine/Geriatric Medicine specialist, the review by the Physical Medicine and Rehabilitation specialist, a psychiatric note, and a series of nurse, physician, and therapist notes. (A.R. 180-181.)

The first letter from Ms. Calabree's physician recommended that Ms. Calabree "have nursing care and supervision twenty four hours per day due to her medical condition." (A.R. 179, 268.)  The second letter stated that that Ms. Calabree "is unable to take care of her financial affairs, make medical decisions or make decisions regarding her Power of Attorney regard [sic] due to a diagnosis of moderate to severe dementia." (A.R. 219.) Ms. Calabree's own physician indicated that she needed supervision and was unable to care for herself. The physician did not recommend any form of treatment or indicate that measures could be taken to improve Ms. Calabree's condition.

The first MOIRA review noted that Ms. Calabree "was not in any type of program to improve function." (A.R. 234-235.) In addition, because there was no significant change in her medical condition, she did not require frequent monitoring or change in medication that would require medical supervision. (A.R. 234-235.) The second MOIRA review looked at Ms. Calabree's physical therapy reports and progress reports. The review found that these reports indicated that there were no rehabilitative goals prescribed and no progress to obtain any such goals had been made. (A.R. 180-181.)

There are also pages of handwritten notes from nurses who worked with Ms. Calabree on a daily basis. The notes primarily indicate that Ms. Calabree was not compliant in taking her medications, eating her meals, going to bed, and needed assistance in other daily activities such as using the toilet. (A.R. 300-312.) Handwritten notes from physical therapy indicate that therapy

was undertaken in an effort to abate frequent falls, increase the ease of transfers, and improve poor safety awareness, but did not intend to permit Ms. Calabree to live outside the controlled environment of the nursing home. (A.R. 322-326.)

The evidence in the administrative record, as summarized above, indicates that Ms. Calabree suffered from severe dementia in addition to behavior disturbances, gait dysfunction, multiple myeloma, anemia, hypertension and neuropathy. There were no treatments that were offered to Ms. Calabree in order to improve her condition and permit her to eventually live outside the nursing home. Rather, Ms. Calabree needed to be supervised around the clock and assisted with daily activities such as getting out of bed, using the toilet, and being fed. Ms. Calabree was not expected to convalesce. As a result, the substantial weight of the evidence provides support for the Administrator's determination that Ms. Calabree's care was custodial and therefore excluded under the Plan.

Based on the foregoing, summary judgment on Count I will be granted in favor of Defendant and against Plaintiffs.[3]

      b. Count II – Claim for Breach of Fiduciary Duty

In the alternative, Plaintiffs seek to recover for breach of fiduciary duty because Defendant "misled Plaintiffs as to the coverage of Ms. Calabree's care" based on "the fact that Ms. Calabree's care had previously been determined to be covered by the Plan, in tandem with Defendant's assertion that Ms. Calabree's coverage would not change." (Amend. Compl., 13-cv-7371, ¶ 21.) Defendant seeks summary judgment on Count II for three reasons (1) the Defendant is an ERISA plan, not a fiduciary, and cannot be sued as such; (2) even if it were a plan, no fiduciary duty has been breached, and (3) breach of fiduciary duty is not cognizable where the plaintiff is pursuing the same remedy in a claim for denial of benefits. (MSJ at 9-10.) Because this third argument ignores Plaintiffs' Complaint, which properly asserts the two counts in the alternative, and because the Court will not permit Count I to proceed, the Court will dismiss this argument out of hand.

---

[3] Plaintiffs focus greatly on imperfections in the administrative process in order to support their claim that Defendant is not entitled to arbitrary and capricious review. The Court notes that, even if these procedural imperfections were so great as to require *de novo* review, the undisputed evidence is so overwhelming that the decision of the Administrator would still be upheld. For example, Plaintiffs' main argument is that the administrator did not evidence to determine that Ms. Calabree "requires a protected, monitored, and controlled environment." (Resp. 17.) But the letter submitted by Ms. Calabree's own doctor specifically said that she "must have nursing care and supervision twenty four hours per day due to her medical condition." (A.R. 268.) Therefore, regardless of the standard of review applied, the decision of the administrator must be upheld.

Plaintiffs' claim for breach of fiduciary duty is brought under 29 U.S.C. § 1132(a)(3) to seek redress for a violation of any provision of ERISA. Plaintiffs, however, fail to state in their Amended Complaint which provision of ERISA Defendant violated. In addition, aside from one initial footnote defending Count II in light Defendant's third argument, Plaintiffs set forth *no argument* as to why summary judgment on Count II should not be granted. This Court will presume that, because Plaintiffs claim a breach of fiduciary duty, they attempt to set forth a claim under 29 U.S.C. § 1109(a), which establishes "liability for breach of fiduciary duty." But because the Plan itself is not a fiduciary within the meaning of the statute and therefore is not properly sued here, the Court will grant Defendant's Motion for Summary Judgment as to Count II.

A cause of action for breach of fiduciary duty is established under 29 U.S.C. § 1109(a). The statute provides that "any *person* who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be *personally* liable to make good to such plan any losses to the plan . . ." The statute defines the term "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). The definition, by its plain terms, does not encompass a Plan itself. *Ranke v. Sanofi-Synthelabo, Inc.*, No. CIV.A. 04-1618, 2004 WL 2473282, at *2 (E.D. Pa. Nov. 3, 2004) (Joyner, J.) ("The ERISA definition of "person" includes individuals, corporations, and other associations, but does not include employee benefit plans.") aff'd, 436 F.3d 197 (3d Cir. 2006); *see also Alderfer v. Clemens Markets, Inc.*, No. CIV.A. 10-4423, 2010 WL 5258070, at *4 (E.D. Pa. Dec. 23, 2010) ("employee benefit plans are not 'persons' under ERISA).[4] Furthermore, because Plaintiffs make no argument as to why Count II is legally viable, there is no argument as to why the Plan should count as a "person" in this particular instance. Therefore, because the Plan is not a "person" within the meaning of the statute, it is not a proper defendant.

Based on the foregoing, summary judgment on Count II will be granted in favor of

---

[4] District Courts in this and other Circuits have taken the same approach. *See Kaliszewski v. Sheet Metal Workers' Nat'l Pension*, No. 03–216E, 2005 WL 2297309, at *3 (W.D.Pa. July 19, 2005) ("[a] breach of fiduciary claim cannot be maintained against the Fund"); *see also* W*omack v. Orchids Paper Products Co. 401(K) Sav. Plan*, 769 F. Supp. 2d 1322, 1328 (N.D. Okla. 2011) ("The Plan itself cannot be held liable for breach of fiduciary duties pursuant to § 1132(a)(2) because the Plan cannot be a fiduciary of itself."); *Foltz v. U.S. News & World Report, Inc.*, 613 F.Supp. 634, 641 (D.D.C.1985) ("[t]he Plan, of course, cannot be a fiduciary of itself").

Defendant and against Plaintiffs.

## **CONCLUSION**

Based on the foregoing analysis, summary judgment is granted in favor of Eaton Medical Plan for Retirees and against Leanard A. Calabree and Julia Manieri as Executors of the Estate of Lucille Calabree.

An appropriate order follows.


BY THE COURT:


/s/ C. Darnell Jones, II
C. DARNELL JONES, II      J.